UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| MARVIN RALSTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:05-CV-00341 |
| | ) | |
| SUIZA DAIRY GROUP, L.P., | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

Plaintiff Marvin Ralston brought this suit against Defendant Suiza Dairy Group, L.P.,

under the Federal Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §

1001, *et seq.*, claiming that he was wrongly denied long term disability ("LTD") benefits for

which he was eligible through his employment with Suiza. (Compl. ¶¶ 1, 19.)  Suiza now moves

for summary judgment on all of Ralston's claims, contending that the denial of LTD benefits to

Ralston was neither arbitrary nor capricious.[1] (Docket # 16.)  The motion was referred to the

undersigned Magistrate Judge on August 28, 2006, by District Judge Theresa Springmann for the

issuance of a Report and Recommendation. (Docket # 27.)

Having reviewed the record and pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule

72.1(d)(1), the undersigned Magistrate Judge recommends that Suiza's motion for summary

judgment be GRANTED.  This Report and Recommendation is based on the following facts and

---

[1] Also pending is a Motion for Court to Take Judicial Notice of Multi-State Market Conduct Examination (Docket # 21) filed by Ralston.

principles of law.

## II. FACTS AND PROCEDURAL HISTORY

### A.  Suiza's LTD Benefit Plan

The parties agree that Suiza's employee disability plan is funded, at least in part, by a group policy of LTD insurance issued by Unum Life Insurance Company ("Unum") and that Suiza's disability plan grants Unum express discretionary authority to determine eligibility for benefits and to interpret the terms of the plan.[2] (*See* Mem. in Supp. of Def.'s Mot. for Summ. J. at 1; Pl.'s Resp. to Def.'s Mot. for Summ. J. at 1, 10; R. at 508.)

To be "totally disabled" under the plan, an employee must be "in a continuous state of incapacity due to illness" which:

> 1.  while it continues throughout the Elimination Period and during the following 24 months of incapacity, prevents him from performing all of the material duties of his Regular Occupation;[3] and

> 2.  while it continues thereafter, prevents him from engaging in any occupation for which he is or becomes reasonably qualified by education, training or experience.

(R. at 518-19.)  An employee's "Regular Occupation" is defined as the "profession, trade, work or the means of earning a living in which the Employee was primarily engaged immediately prior to commencement of Disability." (R. at 518.)

---

[2] Unum's claim file, which it represents contains all of the information and evidence that was before Unum at the time of its final decision, is authenticated by the Affidavit of Warren Diegel, a Disability Benefits Consultant for Unum, and was filed under seal. (*See* Mem. in Supp. of Def.'s Mot. for Summ. J. at 2 n.1, Ex. 1.)  The claim file is numbered in descending numerical order, and its documents are referred to herein as "R. at ___."  The Court has thoroughly reviewed all 994 pages of the administrative record.

[3] Under the policy, the Elimination Period begins with the employee's first day of Disability and ends after an uninterrupted Disability period of six months. (R. at 515.)

*B.  Ralston's Medical Evidence*

On February 23, 2002, Ralston, who was fifty-three years old at the time, stopped working at his job at Suiza due to abdominal pain. (Compl. ¶ 6; R. at 444, 526.)  During his six years as an employee of Suiza, his responsibilities included driving a semi-truck for the dairy, delivering milk, and loading and unloading the semi-truck. (Compl. ¶¶ 6, 8.)  However, due to a work-related back injury in 2001, Ralston was performing light duty at the time he stopped working. (R. at 290.)  Prior to his employment with Suiza, Ralston worked for eighteen years as a semi-truck driver for a grain company. (Compl. ¶ 7.)

On February 25, 2002, Ralston underwent surgery to remove his gallbladder. (R. at 251.) While the surgery alleviated his abdominal pain, Ralston began to experience shortness of breath and soon returned to the hospital. (R. at 143, 251, 359.)  Ralston's shortness of breath was primarily attributed to a pulmonary embolism, which was treated with Coumadin. (R. at 143, 251, 359.)

At the time of his gall bladder surgery, Ralston's family practitioner was Glenn Glogas, M.D.  Ralston visited Dr. Glogas numerous times in 2002, both before and after his gall bladder surgery, complaining of a variety of maladies, including shortness of breath, radiating pain in his neck and jaw, anxiety, abdominal and rib pain, memory loss, back pain, and fatigue. (R. at 629-45, 643-47.)  As a result, Dr. Glogas referred Ralston for a variety of tests and to numerous specialists. (R. at 629-45, 643-47.)

On April 23, 2002, Ralston visited Barbara Nohinek, M.D., an infectious disease specialist, by referral of Dr. Glogas. (R. at 60-61.)  Dr. Nohinek noted that Ralston had "extreme

shortness of breath and dyspnea on exertion, with walking any distance, even when moving from an exam table to a chair." (R. at 60-61.)  She further opined that "[o]verall, he is better than he was initially but certainly has not improved enough to have any meaningful day to day activity[,] and due to his breathing problems, he cannot sustain any physical exertion." (R. at 60-61.)  She recommended that Ralston seek further evaluation for his shortness of breath. (R. at 60-61.)

On May 15, 2002, Ralston visited John Fouts, M.D., a pulmonologist, by referral of Dr. Glogas, for his complaints of shortness of breath on exertion. (R. at 355-57, 359.)  Dr. Fouts noted that Ralston's pulmonary function studies from March 2002 showed "mild obstruction with improvement after inhaled bronchodilator." (R. at 356.)  Dr. Fouts opined that Ralston's "current complaints are out of proportion to abnormalities that have been noted by testing at this point," recommending that Ralston return for a follow-up visit and repeat pulmonary function testing in several weeks. (R. at 356.)

On May 22, 2002, Ralston visited Andrew Katz, M.D., concerning a liver abscess. (R. at 306.)  At the appointment Ralston complained of a poor appetite and maldigestive symptoms. (R. at 306.)

On June 19, 2002, Ralston underwent an MRI of his cervical spine, which showed degenerative disc disease "with minimal disc nuclear collapse at C5 and C6" and "anterior partial subligementous disc protrusion with overhanging marginal spurs." (R. at 304.)

On July 12, 2002, Ralston returned to Dr. Fouts for a re-evaluation of his pulmonary status. (R. at 358, 360.)  Dr. Fouts observed that Ralston was "generally feeling better," although he displayed anxiety and some tremors. (R. at 360.)  Ralston expressed concern to Dr. Fouts that

his former job had been eliminated and that he thought he would probably be "fired from that position." (R. at 360.)  Upon clinical examination, Dr. Fouts noted that Ralston's lungs were clear, that his chest x-ray was normal, and that spirometry showed minimal obstruction with no change after bronchodilation. (R. at 360.)  Dr. Fouts stated that Ralston likely had minimal reactive airway disease that was being appropriately treated, opining that his "pulmonary status at this point is quite stable." (R. at 358.)  Dr. Fouts deferred to Dr. Glogas regarding Ralston's potential return to work, but emphasized that he did "not think that he should be limited due to his pulmonary status." (R. at 358.)

On July 17, 2002, Ralston underwent a CT scan of his abdomen and pelvis, which showed an eight-millimeter "stable indeterminate low density lesion." (R. at 297.)

On July 24, 2002, Ralston returned to Dr. Glogas and underwent a stress treadmill procedure, after which Dr. Glogas opined:

> Talked at length about potential disability.  I said I have no objective evidence that there is any physical reason that he can't do work other than his prior injury with his back and lung field capacity limitations from his prior Workman's Comp injury.  He did well on the stress treadmill.  He had a normal echo.  I reaffirmed that he never had heart failure even though he was diagnosed with it in the hospital after his GB.  It was pulmonary edema secondary to pulmonary emboli. His respiratory status is not that severe.  I think probably long term, he can work with possible retraining.  He is going to get a disability attorney and they are going to talk about long term, what they need to do to get him stabilized and hopefully get back to work.

(R. at 643.)

On July 30, 2002, Ralston visited Bryon J. Stephens, M.D., a surgical specialist, for a follow-up from his gall bladder surgery. (R. at 283.)  After examination, Dr. Stephens opined: "From my point of view [Ralston] has recovered from his cholecystectomy and is free to go back

5

to work without restrictions." (R. at 283.)

On August 16, 2002, Jerry Davis, Ph.D., who had seen Ralston once or twice a month since January 2002, completed a Report of Psychiatric Status at the request of the Disability Determination Bureau. (R. at 330-37.)  He reported that Ralston was "nervous and moody," that his consciousness was "clouded," and that he has "some lapse in memory." (R. at 330-37.)  Dr. Davis further indicated that Ralston experienced restlessness, fatigue, muscle tension, difficulty concentrating, difficulty sleeping, difficulty with remembering daily events and what he reads, depressed mood, diminished interests, loss of appetite, and some slurred speech. (R. at 335.)  He opined that Ralston would be unable to do simple tasks at work due to his lack of concentration, low energy, and shortness of breath. (R. at 332.)  Overall, Dr. Davis concluded that Ralston's physical condition exacerbated his depression and anxiety and that his progress was "not significant due to physical deterioration." (R. at 332.)

On August 22, 2002, Ralston visited Robert Shugart, M.D., an orthopaedic surgeon, for a second opinion about his work-related back injury. (R. at 288-92.)  Dr. Shugart ordered an MRI to rule out any pathology and released Ralston to return to work with the "same permanent restrictions" identified in his functional capacity evaluation.[4] (R. at 288-92.)

On August 28, 2002, Ralston returned to Dr. Glogas, complaining of memory loss and shortness of breath. (R. at 286.)  Dr. Glogas attributed Ralston's shortness of breath to "possible mild asthma" with a "possible anxiety component." (R. at 286.)

---

[4] Dr. Shugart does not elaborate as to the nature of Ralston's permanent restrictions, and the functional capacity evaluation does not appear to be included in Unum's claim file.

On September 1, 2002, Ralston underwent a spirometry and lung volume study, which showed a "moderate degree of obstructive as well as restrictive pattern." (R. at 416.)

On September 5, 2002, Ralston returned to Dr. Shugart to discuss the results of his MRI, which showed "degenerative changes" that contribute to "mild degrees of spinal and foraminal narrowing at the lumbar region, but without demonstration of secondary nerve root compression/displacement." (R. at 279, 284.)  Dr. Shugart concluded that all of the clinical findings were degenerative in nature, rather than arising from an injury, and that he did "not really have a lot to offer him." (R. at 279.)

On October 8, 2002, shortly after Ralston's claim for LTD benefits was first denied, Dr. Glogas penned a letter asserting that Ralston could not return to work until his pulmonary problems were further evaluated and resolved. (R. at 345.)  Dr. Glogas also completed a supplemental statement that asserted Ralston was limited to sedentary work, assigning him the following restrictions: "no exposure to humidity or fumes, extreme temperatures or changes in temperature, [and] no significant exertion." (R. at 349.)

Soon thereafter, Dr. Glogas referred Ralston to T.D. James, M.D., a pulmonologist, for a second opinion about his pulmonary status, as Ralston was unhappy with Dr. Fouts. (R. at 644.) On November 11, 2002, Dr. James opined that Ralston was unable to work due to chronic obstructive pulmonary disease ("COPD"), emphysema, obesity, and history of pulmonary embolism, stating that Ralston's activity was "limited by exertional respiratory distress." (R. at 413.)  He referred Ralston to pulmonary rehabilitation for ten weeks. (R. at 413.)

On April 10, 2003, Ralston was seen by Thomas Banas, M.D., per referral of Dr. Glogas,

7

for a consultation concerning mild cognitive deficits. (R. at 673.)  He noted that Ralston had a "high degree of anxiety" and restless leg syndrome. (R. at 673.)  Ralston admitted that he felt anxious, that he was having trouble sleeping, and that he was having difficulty communicating with his wife, but that he was undergoing counseling. (R. at 673.)  Dr. Banas concluded that "[i]t is difficult to read cognitive deficits with the degree of anxiety and personality traits that are histrionic in character," and prescribed medication designed to calm Ralston. (R. at 673.)

On June 6, 2003, Ralston underwent a CT scan of his abdomen and pelvis, which confirmed a "small stable benign appearing lesion within the right lobe of the liver" and an enlarged prostate. (R. at 677-78.)  The study was negative in all other respects. (R. at 677-78.)

On June 27, 2003, Ralston visited Dr. Glogas, complaining of short-term memory problems, abdominal pain, and urinary frequency. (R. at 690.)  Dr. Glogas stated: "[A]ll labs were completely normal including CBC.  No evidence of recurrent abscess in the liver on CT scan. . . .  He has a lot of constipation. . . . Doesn't sleep too well.  A lot of anxiety." (R. at 690.)  Dr. Glogas further opined that Ralston's abdominal pain was likely "a benign process, likely irritable bowel." (R. at 690.)  Dr. Glogas then adjusted Ralston's medication. (R. at 690.)

In January and February 2004, Ralston visited Dr. Glogas several times, complaining of various symptoms such as sharp back pain and numbness in his leg and foot, as well as stiffness, right upper quadrant pain, and wheezing. (R. at 778-81.)

On February 18, 2004, Ralston underwent a CT scan of his abdomen and pelvis, which revealed tiny bilateral renal calculi, an enlarged prostate, and a small, stable "liver lesion not significantly changed as compared to a prior study dated 6/6/03." (R. at 791, 819.)

On February 26, 2004, Ralston visited Jaime Salomon, M.D., a staff physician in the Veterans Administration health system ("VA"), complaining of recurrent right side rib pain and a lack of appetite. (R. at 853.)

On March 5, 2004, Dr. James reported Ralston's COPD as "stable" and encouraged Ralston to pursue a weight reduction diet and regular exercise. (R. at 764-66.)

In March and April 2004, Ralston visited Sushil Jain, M.D., complaining of constipation and right upper quadrant abdominal pain. (R. at 807-12.)  Dr. Jain noted no evidence of an abscess, prescribed medication for Ralston's complaints, and scheduled a colonoscopy, the results of which were normal. (R. at 807-12.)

On April 7, 2004, Ralston underwent a pulmonary function test, which revealed a "mild degree of obstructive pattern." (R. at 768.)  The findings from the test were "compatible with the diagnosis of chronic bronchitis with mild obstructive pattern and obesity." (R. at 768.)

In 2003 and 2004, Ralston visited Avelina Vitug, M.D., a psychiatrist at the VA, who diagnosed him with "adjustment order with depression," noting that he experienced sleep difficulties, some memory loss, and anxiety. (R. at 851-52.)  Dr. Vitug, who saw Ralston approximately once every three months, indicated that Ralston had fair judgment and insight and that he was coping well with medication. (R. at 851-52.)

On May 20, 2004, Ralston returned to Dr. Salomon, complaining of right upper quadrant pain. (R. at 853-55.)  Dr. Salomon noted that Ralston's upper quadrant pain was of "unclear etiology" and that he had normal cardiac function. (R. at 853-55.)

*C.  Unum's Response to Ralston's Claim for LTD Benefits*

On March 8, 2002, Ralston filed his claim with Unum for short term disability ("STD") benefits and began receiving STD benefits effective March 3, 2002. (R. at 346.)

On June 17, 2002, Anne Roza, R.N., reviewed Ralston's file on behalf of Unum, concluding that his medical records appeared to support impairments of dyspnea, pulmonary embolism, possible reactive airway disease, chronic back pain, anxiety, and probable sleep apnea. (R. at 66-67.)  She noted that Ralston was scheduled for repeat pulmonary function testing and a neurological evaluation and requested that updated records be provided. (R. at 66-67.)

On July 19, 2002, Deby Hazelwood, R.N., reviewed Ralston's file on behalf of Unum, noting that (1) Ralston continued to report dyspnea with exertion and remained in treatment for irritable bowel syndrome, hypothyroidism, and chronic back/neck pain with nonspecific tremor; (2) his liver abscesses were resolved; and (3) Unum was waiting for updated pulmonary information. (R. at 93-95.)  She opined that Ralston "remains supported for inability to safely drive a commercial truck through 8/30/02, and possibly beyond that date." (R. at 93.)  Three days later, Unum extended Ralston's STD benefits through August 25, 2002, and referred his case for LTD benefits review. (R. at 97.)

On August 8, 2002, Ann Marie Germain, R.N., reviewed Ralston's file on behalf of Unum, concluding that his medical records appeared to support impairments of pulmonary embolism, possible reactive airway disease, chronic back pain, anxiety, and probable sleep apnea. (R. at 117-18.)  She opined that Ralston's record supported limitations that would prevent

10

him from walking more than fifty feet, carrying more than fifteen pounds, lifting more than

fifteen pounds, or concentrating for extended periods of time. (R. at 117-18.)

On September 5, 2002, Bradford Sturman, R.N., reviewed Ralston's updated medical

record on behalf of Unum, including Dr. Glogas's release of Ralston to return to work from a

pulmonary standpoint in July and several other negative test results. (R. at 254-58.)  Sturman

noted that Ralston had pulmonary emboli and a liver abscess following his gall bladder removal,

but clarified that the Coumadin therapy Ralston received for his pulmonary emboli would not

preclude his return to work. (R. at 254-58.)  He further opined that Ralston's pulmonary and

cardiac testing indicated that he is capable of returning to work without any restrictions or

limitations. (R. at 254-58.)  Thus, Sturman advised Unum that based on the most recent medical

information, Ralston was not disabled beyond July 24, 2002, from his regular occupation. (R. at

254-258.)

On September 26, 2002, Laird Caruthers, M.D., reviewed Ralston's entire file on behalf

of Unum, stating that "[t]here is zero evidence of a work capacity impairment beyond July 24,

2002, and both claimant's primary care physician and his pulmonologist concur." (R. at 259.)

As a result, on October 1, 2002, Unum issued a letter to Ralston denying him LTD benefits. (R.

at 266-69.)

Soon thereafter, Ralston appealed Unum's denial of LTD benefits. (R. at 374-76.)  On

October 29, 2002, Dr. Caruthers again reviewed Ralston's file on behalf of Unum, concluding

that Dr. Glogas had "flip-flopped" his opinion between his July 24 progress note, which stated

that Ralston's "respiratory status is not that severe," and his October 8 letter, which stated that

11

Ralston could not return to work until his pulmonary problems were resolved. (R. at 366-67.)

Dr. Caruthers concluded that Ralston was "doctor-shopping" for pulmonologists, opining that

"[t]here is still zero evidence of a significant work capacity impairment in the medical

documentation." (R. at 366-67.)

On November 14, 2002, Larry Ianetti, Ph.D., reviewed Ralston's record on behalf of

Unum. (R. at 409.)  He noted that Ralston experienced a "moderate range of difficulty" and a

"moderate degree of clinical distress" with respect to his depression and anxiety, opining that his

symptoms "would have an adverse impact on his performance and on his ability to safely

navigate." (R. at 409.)  He suggested that Ralston's updated medical records be obtained and that

another review be performed in four-to-six months. (R. at 409.)  One week later, Sandra Tilley,

R.N., performed an additional medical review on behalf of Unum, noting that Ralston was

currently enrolled in pulmonary rehabilitation and concluding that a diagnosis of COPD was

appropriate. (R. at 420.)  On December 3, 2002, Unum approved LTD benefits for Ralston. (R. at

425.)

On May 28, 2003, Christopher Murphy, R.N., reviewed Ralston's medical file and

recommended that Ralston's medical and psychological records be updated, particularly the

records of his new pulmonologist, Dr. James, and the records from his pulmonary rehabilitation.

(R. at 400.)

On August 5, 2003, Ralston phoned Unum to inquire whether it offered vocational

assistance, explaining that he was currently studying computer science through the Indiana State

Rehab Program. (R. at 651.)  As a result, on September 8, 2003, Susan Kern, a vocational

rehabilitation consultant, conducted a vocational rehabilitation initial review with Ralston, noting that he was "excited about the prospects of a career change." (R. at 665-67.)  Ralston reported that he had completed three classes toward an associate degree in computer science at Ivy Tech during the last two semesters and had earned a 4.0 grade point average, stating that he would like to earn a four-year degree. (R. at 665-67.)  In her documentation, Kern stated that Unum could not complete a vocational assessment until Ralston's medical condition was stabilized, all updated medical information was obtained, and permanent restrictions and limitations were assigned. (R. at 665-67.)

On November 26, 2003, Thomas Hashway, M.D., a specialist in cardiovascular disease and internal medicine, reviewed Ralston's updated medical file on behalf of Unum, concluding that although Ralston's pulmonary function test results varied, his exertional capacity remained intact and there was no basis for any further impairment. (R. at 693-95.)

On June 24, 2004, Shirley Yeager, R.N., conducted a clinical review of Ralston's file on behalf of Unum and concluded that Ralston appeared to be "stable" in all diagnoses. (R. at 892-93.)  She noted that Dr. Davis's and Dr. Vitug's records reflected that Ralston was coping well with his depression through medication and that his small liver lesion was stable. (R. at 892-93.)  She further observed that while Dr. James diagnosed Ralston with chronic bronchitis with mild obstruction, he also indicated that Ralston needed to exercise and lose weight. (R. at 892-93.)  She further indicated that Ralston's pulmonary function test of April 2004 was "really good," though Dr. James recommended that Ralston participate in a reconditioning program prior to returning to work. (R. at 892-93.)  She also noted that Ralston was currently attending school.

13

(R. at 892-93.)  Yeager concluded that Ralston's file did not support continuing restrictions and limitations from any occupation. (R. at 892-93.)

On July 13, 2004, after the collection of additional medical records, Dr. Hashway performed another review of Ralston's medical file on behalf of Unum. (R. at 895-96.)  While he noted that Ralston had a poorly consolidated sleep pattern that may cause daytime fatigue and that Ralston was undergoing counseling for psychological and marital issues, Dr. Hashway concluded that "[t]here is no chronic physical issue . . . that rises to the level of total and permanent occupational incapacity." (R. at 895-96.)  He also reviewed Dr. James's suggestion that Ralston undergo reconditioning and responded that "resumption of work will help to reverse deconditioning." (R. at 895-96.)  Dr. Hashway then concluded that no restrictions or limitations were supported. (R. at 895-96.)  On July 20, 2004, Unum notified Ralston that it was terminating his LTD benefits as of August 22, 2004. (R. at 910-17.)

On August 20, 2004, Ralston filed an appeal to Unum's denial of LTD benefits. (R. at 923, 927.)  As a result, on October 18, 2004, Woolson Doane, M.D., a specialist in internal medicine and board eligible in pulmonary disease, conducted a review of Ralston's medical record on behalf of Unum, succinctly summarizing Ralston's medical history as follows:

> This 56 yr.-old male truck driver whose job was eliminated sometime near LDW stopped work on 2/21/02 for elective cholecystectomy.  The post operative recovery was complicated by multiple small pulmonary emboli and liver abscesses.  The claimant responded to antibiotic and anticoagulant therapy and by 7/24/02 was able to perform heavy exercise during an exercise test.  The claimant was treated for depression with antidepressants and was seeing a psychiatrist at the VA and a counselor at a Family Counseling center for situational adjustment disorder.  The claimant continued to consult his AP for complaints of abdominal discomfort and exertional dyspnea for which the claimant's AP performed multiple tests and sent the claimant to multiple consultants.  Other than irritable

14

> bowel syndrome/constipation and mild COPD, the evaluation of the claimant's
> somatic complaints did not yield evidence of an impairing disease process.
> Likewise, the intensity of treatment as of 2/26/04 for the claimant's situational
> disorder with anxiety/depressive symptoms would not support impaired
> functional capacity as of 8/22/04 and thereafter.

(R. at 954-55.)  Dr. Doane concluded that Ralston was not restricted from a sustained eight-hour

workday of medium to heavy work, specifically opining as follows:

> On 7/24/02 following completion of the graded exercise test demonstrating the
> capacity to perform 10.2 METS of exercise capacity, Dr. Glogas stated: "I said (to
> the claimant) I have no objective evidence that there is any physical reason that he
> can't work other than his prior injury (workers compensation back injury 4/23/01
> with aggravation on 9/17/01) with his back and lung field capacity limitation from
> his prior Workers Comp injury."  Dr. Glogas noted "he could work with
> retraining."  Dr. Shugart discharged the claimant following an 8/29/02 MRI of the
> thoracic and lumbar spine combined with his clinical examination on 8/22/02 that
> did not reveal evidence of neuromuscular dysfunction which would impair work
> capacity.  PFTs performed by Dr. James on 4/7/04 were improved over those of
> 9/18/02 or 3/18/02.  There was evidence of COPD based on the abnormal FEF25-
> 75, airway resistance and residual volume changes indicating peripheral airway
> obstruction compatible with early emphysematous changes.  However, based on
> demonstrated exercise capacity during Pulmonary Rehabilitation in 2002 and
> 2003 as well as exercise tests, the impact of the COPD would not preclude
> sustained work capacity at a 4-5 MET (general heavy labor, operating heavy
> equipment lifting and carrying 50 pounds or less) level for an 8 hour day.  There
> is no medical evidence in the file after 8/22/04 to indicate a change in that
> exercise capacity or change in mental status.

(R. at 955.)  Dr. Doane did, however, opine that "[r]estricting [Ralston's] exposure to known

allergens, if any, and excess levels of dust, chemical fumes and mists or smoke is reasonable."

(R. at 954.)

On October 27, 2004, Unum denied Ralston's appeal for LTD benefits, explaining that

the available medical data did not support restrictions and/or limitations that would prevent

Ralston from performing the duties of his "regular occupation" and that the records clearly

reflected that he had the functional capacity to perform a "medium to heavy occupation." (R. at 968-74.)

### III. STANDARD OF REVIEW

"Although the parties' motions are summary judgment motions, the motions actually seek administrative review of the decision to deny benefits, with the composition of the administrative record being the essential uncontested fact." *Shyman v. Unum Life Ins. Co. of Am.*, No. 01 C 7366, 2004 WL 609280, at *2 (N.D. Ill. March 25, 2004), *aff'd*, 427 F.3d 452 (7th Cir. 2005). "Evidence outside the administrative record is appropriate to consider only to the extent that it goes to procedural issues, such as whether the [p]olicy is an ERISA benefit plan or whether the arbitrary and capricious review applies." *Id.*

Benefit determinations in ERISA cases arising under 29 U.S.C. § 1132 (a)(1)(B) are reviewed under an arbitrary-and-capricious standard, provided that the terms of the employee benefit plan afford the plan administrator "broad discretion to interpret the plan and determine benefit eligibility."[5] *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 575 (7th Cir. 2006), *petition for cert. filed*, 75 U.S.L.W. 3035 (U.S. Jul. 14, 2006) (No. 06-70); *see also Sisto v. Ameritech Sickness & Accident Disability Benefit Plan*, 429 F.3d 698, 700 (7th Cir. 2005). Under the arbitrary-and-capricious standard, the reviewing court "do[es] not ask whether the administrator reached the correct conclusion or even whether it relied on the proper authority." *Kobs v. United Wisconsin Ins. Co.*, 400 F.3d 1036, 1039 (7th Cir. 2005). Rather, the question

---

[5] If the terms of the benefit plan do not vest discretionary authority in the plan administrator, the benefit determinations are reviewed by the court *de novo*. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Here, the parties agree that Suiza's benefit plan vested discretionary authority in Unum and that the arbitrary-and-capricious standard applies. (Mem. in Supp. of Def.'s Mot. for Summ. J. at 1; Pl.'s Resp. at 10.)

16

before a reviewing court is whether the administrator's decision has "rational support in the record." *Davis*, 444 F.3d at 576 (quoting *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004)).  "Put simply, an administrator's decision will not be overturned unless it is 'downright unreasonable.'" *Id*. (quoting *Sisto*, 429 F.3d at 700).

## IV. DISCUSSION[6]

Ralston contends that Unum acted arbitrarily and capriciously when denying his claim for LTD benefits by: (1) failing to have Ralston undergo an independent medical examination, instead relying on reviews of his medical record by Unum's in-house physicians; (2) selectively

---

[6] Ralston filed a Motion for Court to Take Judicial Notice of Multi-State Market Conduct Examination (Docket # 21) in response to Suiza's motion for summary judgment, requesting that the Court take judicial notice of a Report of the Targeted MultiState Market Conduct Examination ("Report") submitted by Ralston.  Per Ralston, the Report was commenced by the Maine Bureau of Insurance, the Massachusetts Division of Insurance, and the Tennessee Department of Commerce and Insurance, with all fifty states choosing to act as participating states in the examination, and addressed claims handling practices for group LTD policies issued by Unum for the purpose of determining whether the disability income claims handling practices reflected systemic "unfair claim settlement practices." (Mot. for Ct. to Take Judicial Notice of Multi-State Market Conduct Examination ¶¶ 2-4.)  Suiza opposes Ralston's motion, asserting that the Report is not admissible under ERISA, is not relevant to Ralston's claim, and fails to meet the criteria necessary for judicial notice. (Def.'s Cross-Mot. to Deny Judicial Notice and Resp. to Pl.'s Mot. for Judicial Notice of Multi-State Market Conduct Examination at 2-8.)

Suiza's arguments are persuasive.  First, the Court is limited in its review to the information that was before Unum at the time of its decision, and the Report is not part of Ralston's claim file. *See Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 982 (7th Cir. 1999).  Second, the Report, which reviewed 299 randomly-selected claim files and identified "several general areas of concern" but reached no conclusions (Report at 6, 10), is seemingly irrelevant to this Court's determination whether Unum acted arbitrarily and capriciously in Ralston's case.  Third, Rule 201 of the Federal Rules of Evidence permits judicial notice of an "adjudicative fact that is both 'not subject to reasonable dispute' and either 1) 'generally known within the territorial jurisdiction of the trial court' or 2) 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997) (quoting Fed. R. Evid. 201(b)).  Here, the "general areas of concern" expressed in the Report hardly rise to the level of findings of fact, as a plan of corrective action agreed upon by the parties and set forth in the Report, which appears in essence to be a settlement agreement, "obviated the need for . . . specific claim findings or reaching a formal conclusion concerning the examination objective." (Report at 10); *see General Electric*, 128 F.3d. at 1084 ("A settlement agreement has none of the indicia of trustworthiness found in a public record or well-established treatise like Gray's Anatomy.")  Moreover, the Seventh Circuit Court of Appeals has stated that "courts generally cannot take notice of findings of fact from other proceedings for the truth asserted therein because these findings are disputable and usually are disputed." *General Electric*, 128 F.3d at 1082 n.6.

Therefore, for the foregoing reasons, the Court will recommend that Ralston's motion to take judicial notice be denied.

relying on evidence that was unfavorable to Ralston's claim and purportedly neglecting to consider the opinions of his treating physicians; (3) failing to accord greater deference to the opinions of Ralston's treating physicians, rather than Unum's in-house reviewing physicians; and (4) failing to produce evidence, such as a functional capacity evaluation, that indicated Ralston was able to "perform his job, or any other, for eight hours a day."[7] (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 12-17.)  While Ralston's arguments will each be discussed in turn, none of them are ultimately successful.

### A.  Unum Did Not Act Arbitrarily and Capriciously by Foregoing an Independent Medical Examination

First, Ralston argues, albeit unsuccessfully, that Unum acted arbitrarily and capriciously by relying on the in-house physicians' review of his medical records, rather than performing an independent medical examination.  Ralston's argument appears two-fold: (1) that Unum should have conducted its own examination of Ralston, rather than relying on reviews of his medical records; and (2) that Unum should have secured physicians who were not in-house with Unum to examine Ralston and/or review his medical record.

In *Davis v. Unum Life Insurance Company of America*, 444 F.3d at 577, the Seventh Circuit Court of Appeals squarely addressed Ralston's first assertion – that Unum acted unreasonably by relying on reviews of Ralston's medical records, rather than directly examining him.  It ultimately discarded the argument as follows:

[N]either the district court nor [plaintiff] has cited, and our research has not

---

[7] While Ralston also sets forth an argument in his response brief entitled "The Plaintiff Has Proven His Entitlement to Benefits," this argument does not merit a separate discussion, as it articulates no specific theory and merely rehashes various points already articulated in his other arguments. (*See* Pl.'s Resp. at 17-20.)

disclosed, any authority that generally prohibits the commonplace practice of doctors arriving at professional opinions after reviewing medical files.  In such file reviews, doctors are fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation.  It is reasonable, therefore, for an administrator to rely on its doctors' assessments of the file and to save the plan the financial burden of conducting repetitive tests and examinations.[8]

*Id*.  Clearly, the first prong of Ralston's argument falls flat.

The second component of Ralston's argument – that Unum unreasonably relied upon in-house physicians in reaching its determination – also fails.  The plaintiff in *Davis* also advanced this argument, but to no avail. 444 F.3d at 575.  The Seventh Circuit opined:

[W]hether a doctor is in-house or not is an irrelevant distinction in this context. . . . When an administrator . . . opts to investigate a claim by obtaining an expert medical opinion – independent of its own lay opinion and that of the claimant's doctors – the administrator is going to pay a doctor one way or another.  Thus, whether the administrator retains in-house doctors (arguably reducing overhead costs for the benefit of the plan's participants and beneficiaries) or pays for freelance doctors makes no difference in this conflict analysis.  Paying for a legitimate and valuable service in order to evaluate a claim thoroughly does not create a view-altering conflict.

*Id*. at 575 (internal citations omitted).  The Seventh Circuit further clarified that if the plan administrator gives the in-house physicians some specific stake in the outcome of the case, such as paying them more if a claim is denied, then the plaintiff may have some validity to his argument. *Id*.  However, a mere theoretical argument that in-house doctors have an inherent conflict in every case is insufficient. *Id*. at 576 ("The singular fact of working in-house does not disqualify a doctor from rendering an independent medical opinion any more than does paying an outside doctor to do the same . . . .").

---

[8] Suiza's LTD benefit plan states that Unum "may" require a claimant to be examined by a medical expert of Unum's choice. (R. at 484.)

Thus, contrary to Ralston's assertion, Unum did not act arbitrarily and capriciously by relying on its in-house physicians' review of Ralston's medical record in reaching its determination, rather than performing an independent medical examination.

B. *Unum's Review of Ralston's Medical Evidence Was Not "Downright Unreasonable"*

Ralston also contends that Unum acted arbitrarily and capriciously by selectively reviewing the medical records in his claim file that support a finding of not disabled and ignoring those that were favorable to his claim.  This argument, however, is not a winner for Ralston either.

To elaborate, Ralston asserts that Unum "completely ignored the plethora of medical evidence substantiating [Ralston's] disability." (Pl.'s Resp. at 14.)  However, the closest Ralston approaches to making a specific assertion is his contention that "Dr. Doane *completely neglected* to consider the opinions of [Ralston's] treating physicians and the medical evidence supporting his disability." (Pl.'s Resp. at 13 (emphasis added).)

In contrast to Ralston's assertion, the "plethora" of evidence indicates quite the opposite – that Unum's review of Ralston's medical file was not "downright unreasonable."  First, as to Ralston's criticism of Dr. Doane, in his review Dr. Doane *expressly articulated* his consideration of the records of Dr. Glogas, Dr. Shugart, Dr. James, Dr. Davis, Dr. Salomon, and Dr. Vitug.  Likewise, Dr. Doane specifically considered the results of Ralston's 2004 pulmonary function test and 2003 sleep study, as well as the findings, which were all normal, of his echocardiogram, an abdominal CT scan, a chest CT scan, and a colonoscopy.  Clearly, Ralston's contention that Dr. Doane "completely neglected to consider the opinions of [Ralston's] treating physicians and

the medical evidence supporting his disability" is completely unfounded.

Moreover, Ralston's bald assertion that Unum "completely ignored the plethora of medical evidence substantiating [Ralston's] disability" and that "Unum's decision to terminate [Ralston's] benefits has *no* support in the record" is without merit. (Pl.'s Resp. at 14, 17 (emphasis added).)  Contrary to Ralston's contention, the record is replete with evidence that Unum's nurses, psychologists, and physicians performed a reasonable review of the evidence in his medical file.[9]  In fact, Unum at times extended Ralston's disability benefits pending its receipt of Ralston's updated medical information. (R. at 66-67, 93-95.)

Thus, Unum's review of Ralston's medical records was clearly not "downright unreasonable," and thus Ralston's second argument is unpersuasive.

### C. Unum Was Not Required to Accord Greater Deference to Ralston's Treating Physicians

Ralston next asserts that Unum acted arbitrarily and capriciously by failing to accord greater deference to his treating physicians than to Unum's reviewing physicians.  However, this

---

[9] To elaborate, Anne Roza's June 2002 review included medical records from Dr. Glogas, Dr. Stephens, and Dr. Nohinek. (R. at 67.)  Deby Hazelwood's July 2002 review included medical records from Dr. Katz, Dr. Allina, and Dr. Glogas, as well as the results of a cervical MRI and an upper extremity EMG. (R. at 93-94.)  Ann Marie Germain's August 2002 review included medical records from the Fort Wayne Neurological Center, Dr. Glogas, Dr. Schumosyl, Dr. Stephens, Dr. Katz, and Dr. Davis. (R. at 117-18.)  Bradford Sturman's September 2002 review included records from Dr. Glogas, Dr. Schomogyi, Dr. Katz, Dr. Nohinek, Dr. Fouts, Dr. Allina, and Dr. Banas, as well as the results of Ralston's chest x-ray, echocardiogram, pulmonary function testing, and CT scans. (R. at 254-57.)  Dr. Caruthers's September 2002 reviewed included Ralston's "entire file," and his October 2002 review included the records of Dr. Fouts, Dr. Stephens, Dr. Shugart, and Dr. Glogas, as well as the results of a CT scan and a Report of Psychiatric Status. (R. at 259, 366-67.)  Dr. Iannetti's November 2002 review included Ralston's 2002 mental health treatment records. (R. at 409.)  In November 2003, Dr. Hashway reviewed Christopher Murphy's summary of the updated records of Dr. Glogas, as well as Ralston's January 2003 discharge summary from pulmonary rehabilitation and an April 2003 letter from Dr. Banas. (R. at 693-94.)  Shirley Yeager's and Dr. Hashway's June 2004 reviews included the 2004 records of Dr. Glogas and Dr. James. (R. at 892-93.)  Dr. Doane's August 2004 review included "the entire paper file as well as the entire content of the electronic file," which included medical records from Dr. Glogas, Dr. Fouts, Dr. James, Dr. Jain, Dr. Vitug, Dr. Shugart, and Dr. Davis. (R. at 955.)

argument by Ralston also fails right out of the gate.

The Seventh Circuit has emphasized that, in contrast to the Social Security context, "ERISA does not require plan administrators to accord special deference to the opinions of treating physicians." *Kobs*, 400 F.3d at 1039; *see also Nord v. Black & Decker Disability Plan*, 538 U.S. 822, 825, 831 (2003) ("Nothing in [ERISA] itself . . . suggests that plan administrators must accord special deference to the opinions of treating physicians."); *Davis*, 444 F.3d at 578. Here, as emphasized *supra*, Unum clearly considered the opinions of the treating physicians in their numerous reviews of Ralston's medical file.  In fact, some treating physicians' opinions, such as Dr. Stephens and Dr. Fouts, were not necessarily inconsistent with Unum's determination. *See generally Davis*, 444 F.3d at 577.

Furthermore, Unum's decision to give less weight to Dr. Glogas's opinion had rational support in the record, considering that his opinion concerning Ralston's pulmonary and return-to-work status seemingly "flip-flopped" between July and October 2002. *See id.* at 578 (concluding that a treating physician was acting "more as an advocate than a doctor rendering objective opinions" when he rendered inconsistent opinions); *Shyman*, 2004 WL 609280 at *19 (discounting the credibility of a claimant's treating physician due to inconsistent statements). Moreover, in rejecting Dr. James's opinion that Ralston should undergo a reconditioning program prior to returning to work, Unum relied upon the opinions of Dr. Hashway and Dr. Doane, who stated that returning to work was sufficient reconditioning; Unum's resolution of a mere difference in medical opinion is not "downright unreasonable."

Thus, contrary to Ralston's contention, Unum did not act arbitrarily and capriciously by

failing to accord greater deference to Ralston's treating physicians in making its determination.

### D.  Unum's Decision That Ralston Could Return to His "Regular Occupation" or a "Medium to Heavy Occupation" Was Not Arbitrary and Capricious

Finally, Ralston contends that Unum acted arbitrarily and capriciously in denying Ralston's LTD benefits because "there is little evidence on Unum's part that indicated [he] was able to perform his job, or any other, for eight hours a day." (Pl.'s Resp. at 16.)  Contrary to Ralston's contention, substantial evidence in Ralston's medical record supports Unum's decision, and thus its determination was not "downright unreasonable."

In determining that Ralston could return to his regular occupation or a medium-to-heavy occupation, Dr. Doane cited Ralston's January 2003 pulmonary rehabilitation records, which reflected that Ralston could walk three-tenths of a mile and perform sixty minutes of aerobic exercise achieving 90-94% of predicted maximum heart rate without experiencing adverse physiological consequences, "reinforcing the ability to sustain 8 hours of moderate to heavy work." (R. at 942.)  Dr. Doane further explained that the results of Ralston's graded exercise test of July 2002 were compatible with GOLD class 1 COPD, which was the *same level* demonstrated by Ralston in a September 2000 exercise test when he was still working full-time.[10]

Additionally, as to Ralston's neuromuscular status, Dr. Doane emphasized that his graded exercise test results of July 2002 did not support the existence of a neuromuscular impairment, explaining that "individuals with significant conditions impairing neuromuscular function of the back and legs cannot achieve 10 METS of exercise capacity on a treadmill using the Bruce

---

[10]  Dr. Doane explains in his review of Ralston's file that a GOLD (Global Initiative on Obstructive Lung Disease) class 1 rating encompasses "primarily physiological changes without impaired functional abilities." (R. at 941.)

protocol without symptoms." (R. at 954.)  As to Ralston's mental status, Dr. Doane observed that while the mental health professionals opined that Ralston experienced generalized anxiety and some memory problems, Ralston at the same time demonstrated fair judgment and insight, was working toward a degree in computer science earning a 4.0 grade point average, and was considered to be coping well with his situational adjustment disorder through medication.[11]

In *Quinn v. Blue Cross and Blue Shield Association*, 161 F.3d 472, 476 (7th Cir. 1998), the Seventh Circuit Court of Appeals explained that a plan administrator is "under no obligation to undergo a full-blown vocational evaluation of [the claimant's] job, but she was under a duty to make a reasonable inquiry into the types of skills [the claimant] possesses and whether those skills may be used at another job . . . ." *See also O'Reilly v. Hartford Life & Accident Ins. Co.*, 272 F.3d 955, 961 (7th Cir. 2001).  In *Quinn*, the plan administrator's representative by deposition admitted that she "did not know what [the claimant's] job duties entailed, what her exertional requirements were, any training and experience she possessed, or any transferable skills she may have obtained." *Id*.  The Court concluded that the plan administrator had acted arbitrarily and capriciously "[b]y not even performing the *slightest inquiry* into the matter . . . ." *Id*. (emphasis added).

In contrast to the plan administrator in *Quinn*, Unum had a sufficient basis upon which to make its determination that Ralston could perform his regular occupation or a medium-to-heavy

---

[11] While Dr. James did recommend that Ralston undergo reconditioning prior to returning to work, Dr. Hashway and Dr. Doane disagreed, opining that Ralston's return to work would be "reconditioning" in itself. Unum's reliance on the opinions of Dr. Hashway and Dr. Doane in this respect, rather than the opinion of Dr. James, is not arbitrary and capricious, as Unum was not required to accord greater deference to the opinion of Ralston's treating physician. *See, e.g., Kobs,* 400 F.3d at 1039.

occupation.  Here, Unum was quite knowledgeable about Ralston's exertional capacity through Dr. Doane's and Dr. Hashway's review of Ralston's pulmonary function testing and graded exercise test.  Furthermore, in contrast to *Quinn* where no physician stated whether or not the claimant had any limitations, Dr. Doane and Dr. Hashway both affirmatively stated that Ralston had *no* restrictions or limitations which would prevent him from performing his regular occupation or a medium-to-heavy occupation.[12]  Stated another way, Dr. Doane and Dr. Hashway both concluded that Ralston's occupational capacity *had not significantly changed* since the date he originally filed his claim for disability as a result of his gall bladder surgery and pulmonary

 emboli.

Moreover, unlike the plan administrator in *Quinn*, Unum did indeed conduct a vocational interview with Ralston to explore his education, training, and experience.  Since Ralston

---

[12] In their documentation, both Dr. Glogas and Dr. Shugart refer briefly to the existence of certain pre-existing restrictions related to Ralston's work-related back injury, which preceded his February 2002 disability filing. (*See* R. at 955, 970.)  However, neither a copy of the restrictions nor the functional capacity evaluation, which apparently gave rise to the restrictions, are included in Unum's claim file.  Even if these restrictions do indeed exist, Unum did not act arbitrarily and capriciously in failing to consider them, since Ralston bears the burden of proving he is disabled under the Suiza plan and he never submitted any information describing pre-existing limitations. (*See* R. at 490); *see generally Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 179 (7th Cir. 1994) (emphasizing that the employee must establish that he has satisfied the conditions necessary to award benefits under the plan); *Wallace v. Reliance Standard Life Ins. Co.*, No. 01-C-0714-C, 2002 WL 32345607, at *7 (W.D. Wis. June 21, 2002).  Here, the information in the 994-page claim file, described *supra* in Section II, was not an insufficient basis upon which Unum could make a reasonable decision. *See O'Reilly*, 272 F.3d at 961 ("Before denying benefits, administrators of ERISA plans are required to have enough evidence to allow them to make a reasonable decision."); *see generally Quinn*, 161 F.3d at 475 (emphasizing that under the arbitrary and capricious standard, the court "will only look at whether the [plan administrator] acted unreasonably, not whether she merely made a mistake").

Furthermore, Dr. Doane emphasized in his opinion that "individuals with significant conditions impairing neuromuscular function of the back and legs cannot achieve 10 METS of exercise capacity on a treadmill using the Bruce protocol without symptoms" and that the results of Ralston's cervical and lumbar MRIs reflected only "degenerative changes of the discs and facets commonly seen in *asymptomatic* individuals in [Ralston's] age group." (R. at 953-54 (emphasis added).)  Thus, it can be reasonably inferred that Dr. Doane did not believe that Ralston warranted back restrictions based on the medical evidence.

ultimately was not assigned any restrictions or limitations as a result of the medical concerns that served as the basis for his February 2002 disability filing, it was not unreasonable that Unum did not complete a "full-blown vocational evaluation."  In fact, there ultimately was *no need* for a vocational assessment, since Dr. Doane and Dr. Hashway opined that Ralston had the capacity to perform the regular occupation that he was performing at the time he originally filed for disability. *See Schaub v. Consol. Freightways, Inc. Extended Sick Pay Plan*, 895 F. Supp. 1136, 1145 (S.D. Ind. 1995) (articulating that there "may be no need for vocational evidence" where there is no indication of impairment and the claimant can resume his normal occupation).

Therefore, based on the medical evidence available to it, Unum's decision that Ralston could return to his regular occupation or a medium-to-heavy occupation was not arbitrary and capricious, and thus Ralston's final argument is unavailing.

## V.  CONCLUSION

For the foregoing reasons, the undersigned Magistrate Judge recommends that the Defendant's motion for summary judgment (Docket # 16) be GRANTED.[13]

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties.  NOTICE IS HEREBY GIVEN that within ten days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or recommendations. Fed. R. Civ. P. 72(b).  FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE

---

[13] Additionally, the undersigned Magistrate Judge recommends that the Plaintiff's Motion for Court to Take Judicial Notice of Multi-State Market Conduct Examination (Docket # 21) be DENIED and that Suiza's Cross-Motion to Deny Judicial Notice (Docket # 26) be GRANTED.

DISTRICT COURT'S ORDER. *See* N.D. Ind. L.R. 72.1(d)(2); *see also Thomas v. Arn*, 474 U.S. 140 (1985); *Lerro v. Quaker Oats Co.*, 84 F.3d 239, 241-42 (7th Cir. 1996).

Enter for this 18th day of September, 2006.

/S/ Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge